**William C. BREEN, Petitioner,**
v.
**UNITED STATES of America, Respondent.**

**Civ. A. No. 67–582–J.**

United States District Court
D. Massachusetts.

Sept. 23, 1969.

F. Emmett Fitzpatrick, Jr., Fitzpatrick & Smith, Philadelphia, Pa., for petitioner.

Herbert F. Travers, Jr., U. S. Atty., Edward J. Lee, Asst. U. S. Atty., for respondent.

## OPINION

JULIAN, District Judge.

William C. Breen, a federal prisoner, has filed a "Motion to Vacate and Set Aside Judgment and Conviction" pursuant to 28 U.S.C. § 2255, seeking to overturn his 1967 convictions arising out of events connected with the armed robbery of the Essex County Bank and Trust Company in Lynn, Massachusetts, on August 26, 1966.

On December 8, 1966, after four days of trial before a jury, petitioner pleaded guilty to all three counts of an indictment charging him with bank robbery, 18 U.S.C. § 2113(a), use of a dangerous weapon in the course of bank robbery, 18 U.S.C. § 2113(d), and conspiracy, 18 U.S.C. § 371. Three codefendants had pleaded guilty prior to the opening of the trial, and a fourth codefendant was found guilty by the jury at the conclusion of the trial five days later.

On the day scheduled for sentencing, December 19, 1966, the trial judge deferred final sentencing of the petitioner and instead ordered him committed to the custody of the Attorney General for a complete study pursuant to 18 U.S.C. § 4208(b). Petitioner was subsequently returned to the court for sentence on March 29, 1967. At that time, however, he moved to withdraw his guilty pleas on the ground that they were not voluntary but were the result of improper advice given and coercion exerted by his counsel prior to the guilty pleas. The trial judge permitted counsel to withdraw his appearance, appointed new counsel to represent the petitioner, and postponed the hearing on the motion for five days to enable new counsel to prepare. An evidentiary hearing was then held on April 3, 1967, following which the trial judge denied the motion to withdraw the guilty pleas.

On April 6, 1967, petitioner was sentenced to concurrent terms of fifteen years for bank robbery, 18 U.S.C. § 2113(a), fifteen years for use of a dangerous weapon in the course of bank

robbery, 18 U.S.C. § 2113(d), and five years for conspiracy, 18 U.S.C. § 371. He is presently serving those sentences.[1] Before imposing sentence the Court found that there was overwhelming evidence of petitioner's guilt of the crimes charged against him. This finding is amply supported by the evidence presented at the trial.

In support of the present motion the petitioner advances two interrelated alleged violations of his constitutional rights:

(1) That his pleas of guilty were neither voluntarily nor understandingly made since, at the time of the plea, petitioner allegedly was "mentally ill and completely incompetent to understand the charges against him"; and

(2) That petitioner was denied his right to the effective assistance of counsel because his retained trial counsel, allegedly knowing that "petitioner received 100% disability for a psychiatric condition from the United States Government," failed to utilize the procedures provided by 18 U.S.C. § 4244 for determining petitioner's competency to stand trial.

This Court held a hearing on January 29, 1969, at which petitioner, represented by retained counsel, appeared and testified.

On the basis of all the testimony and evidence presented at the evidentiary hearing before me, the record and file in the prior criminal case, United States v. Breen et al., Criminal Action No. 66–185–G (D.Mass., filed Sept. 2, 1966),[2] and the medical records referred to later in this opinion,[3] I find that petitioner is not entitled to relief.

■ Petitioner did, in fact, receive Veterans Administration benefits for a 100% service-connected disability at the time he pleaded guilty.[4] That fact by itself, however, does not prove that petitioner was insane or mentally incompetent at the time of his plea or at any other time.

Congress has established wartime and peacetime disability benefits for service-connected disabilities, 38 U.S.C. §§ 310, 314, 331, 334. These benefits vary according to the "rating" of the disability. The section setting forth the standard by which the disability is rated is 38 U.S.C. § 355. The provision states unequivocally that reduction in earning capacity is the standard to be applied. "The ratings shall be based, as far as practicable, upon the average impairments of earning capacity resulting from such injuries in civil occupations." *Id.* Thus, it is clear that petitioner's 100% disability, established by the Veterans Administration, relates to earning capacity, not to mental capacity to understand the nature of judicial proceedings and to assist in his defense.

The preponderance of the credible evidence shows that, despite a prior history of psychiatric illness and despite continued emotional anxiety, petitioner was not insane or otherwise mentally incompetent at the time he pleaded guilty on December 8, 1966.

Petitioner was born on October 27, 1926, in Winchester, Massachusetts, the fourth of nine living children in a family of sixteen. He left high school during

---

1. On April 26, 1967, the trial judge certified that petitioner's appeal was not taken in good faith and denied his application to proceed on appeal without prepayment of costs.

2. The Motion to Vacate purports on its face to be "based upon all the records and files heretofore had in this matter * * *."

3. After the evidentiary hearing, at the initiative of the Court and with the consent of both parties, medical records relating to petitioner's examinations, hospitalizations and treatment prior to December 8, 1966, were obtained from the Veterans Administration, the Bureau of Prisons and the Massachusetts General Hospital. In addition, a letter from the Superintendent of Westborough State Hospital was submitted at the request of petitioner's counsel.

4. Letter dated June 5, 1969, from L. J. Cochrane, Contact Officer, V. A. Center, Philadelphia, Pa.

the tenth grade and, after various jobs, entered the Navy in 1944. While stationed as a shipfitter on Guam he suffered and was treated for a psychic trauma when he cut through a ship's compartment filled with the bodies of drowned seamen. He was honorably discharged in July 1946. At some point he was awarded Veterans Administration benefits for a service-connected psychiatric disability, which was gradually increased to 100%.

Petitioner married in 1948. During the fifteen years following his discharge he held approximately twenty-five jobs, all unskilled. He commenced outpatient treatment in 1955 at the Veterans Administration Mental Hygiene Clinic in Boston, where the following diagnosis was made:

"Passive-aggressive personality with anxiety features, chronic, moderate— manifested by intermittent impulsive- aggressive outbursts, difficulty in dealing with authority figures, excitability and ineffectiveness under relatively minor stress, periodic hyperpnea, and difficulties in his vocational adjustment."

Petitioner's degree of incapacity was reported to be "moderate," with a guarded but hopeful prognosis.

A Veterans Administration psychiatrist also examined the petitioner twice in January and August 1955 for evaluation of possible compensable disabilities. The two diagnoses were, respectively: "Inadequate personality, with superimposed anxiety reaction, mild" ; and "anxiety reaction, moderate, in a passive aggressive personality." Petitioner's home life throughout this period was marked by impulsive violence and physical abuse toward his wife, intermittent desertions and general unhappiness, including an attempt to commit suicide sometime in 1956 or 1957.

In 1956 petitioner was appointed to the Somerville police force and remained a member of the force for several years until his employment was terminated for conduct unbecoming an officer. In January 1960, following acts of violence toward both his wife and his "girl friend," he was admitted on a voluntary basis to an open ward of a Veterans Administration hospital for psychiatric treatment. His condition was diagnosed as a "severe"

"[b]orderline schizophrenic reaction, paranoid type, manifested by suspiciousness, suggestions of paranoid ideas, uncontrolled impulsive aggressive behavior, insomnia, and depression."

While he was hospitalized in the open ward during the early Spring of 1960, petitioner

"developed manifestations of increasing anxiety as well as progressively impaired control. He demonstrated impulsive behavior including unauthorized departure from the hospital and a variety of annoying telephone calls to outsiders."

For these reasons petitioner was transferred on May 18, 1960, to a locked ward. He remained there until June 10, 1960, when—during his first guided outing, a hospital picnic—he "eloped" (meaning "escaped"), returned to his girl friend's house and became physically abusive. He never returned to the Veterans Administration hospital. His diagnosis at the time of his escape was

"emotionally unstable personality with transient episodes of psychosis. * * Impairment: Severe at time of discharge, in that the patient manifested his recurrent impairment of self control by eloping from hospital, and demonstrating impulsive destructive behavior. * * * Competency: The patient is both mentally and financially competent."

Petitioner was arrested, charged with assault and battery, and taken before the Somerville District Court on June 11, 1960. That court committed him to the Westborough State Hospital for observation pursuant to M.G.L. c. 123, § 100. There the medical staff diagnosed him as suffering from "psychoneurosis, anxiety type." He was "quiet and cooperative, friendly, calm, spoke coherently and

relevantly, showed no signs of confusion, blocking or retardation. His emotions appeared to be appropriate. He was oriented in all three spheres." By July 7, 1960, he was described as having recovered, and was then returned to the Somerville District Court.

One week later, while awaiting trial, petitioner sought outpatient psychiatric help at Massachusetts General Hospital in Boston. He was interviewed on July 25 and on August 16 and 18, 1960, but failed to return thereafter. The report of the evaluation conference concerning petitioner did not reveal a diagnosis of any existing mental incompetence or psychosis. The outcome of the assault and battery charge is unknown.

Less information appears in the record concerning petitioner's activities thereafter. It is clear, however, that he was not rehospitalized and that he stopped seeking treatment. Following his divorce from his first wife in 1962, petitioner moved to Florida with his common law wife and supported his wife and a new baby with the proceeds of illegal gambling from a casino in which he was co-owner. His difficulties with the law increased markedly in the year preceding his arrest for the bank robbery here involved.

The next known medical evidence relating to petitioner's mental condition is the Classification Study conducted by the Bureau of Prisons in early 1967 at the direction of the trial judge pursuant to 18 U.S.C. § 4208(b). The examining psychologist concluded:

"The subject was correctly oriented in all spheres. His responses to questions were relevant and coherent and there were no obvious indications of any thought disorder or memory defect. * * * Recorded test results * * *

show him to have a revised Beta IQ of 113 or bright normal intelligence.

"The psychological tests administered at the stated time reveal some moderate to severe antisocial trends. There are no strong indications of any psychoneurosis and no indications of any psychosis."

Under "Discussion," he added:

"Although the subject has a documented psychiatric history and is now drawing a 100% disability from the Veterans Administration, the present interview and extensive testing does [sic] not reveal any significant residuals of his former psychiatric impairment. At the present time he appears to be an emotionally unstable individual with moderate to severe antisocial trends."

A similar conclusion was reached by the Classification Committee which, after reviewing his case thoroughly, found petitioner to be

"a criminally ideated individual who has no respect for the rights of others. * * * Treatment needs in this case are considered minimal. * * * Considering his past psychiatric history and hospitalizations for psychiatric disorders it is possible that Breen may need psychiatric treatment from time to time. At this time, and [sic] evaluation by our staff psychiatrist indicates that Breen is presently functioning in a normal manner and is not in need of immediate psychiatric care. * * * "

■ The conclusion that petitioner's prior psychiatric illness had been corrected is corroborated by the evidence in the record describing petitioner's conduct prior to and after the bank robbery in question,[5] by a review of the change-of-

5. Several employees of the bank testified that they saw petitioner in the bank during the week before (Tr. of Dec. 2, 1966, pp. 61–62) and on the day before the robbery (Tr. of Dec. 2, 1966, pp. 47–48, 82, 136). Another witness testified in detail concerning petitioner's social companionship with the codefendants prior to the robbery (Tr. of Dec. 6, 1966, pp. 5–24), and of his efforts to have her rent a car and a garage to be used by him and the others during the robbery (Tr. of Dec. 6, 1966, pp. 41–52; Tr. of Dec. 7, 1966, pp. 80–86, 98), and of his

plea hearing transcript,[6] by the testimony of petitioner's trial counsel and trial counsel for a codefendant concerning the discussions preceding the change of plea,[7] by petitioner's own ability to recall on April 3, 1967, details of the trial and of the change-of-plea hearing,[8] by the contents of the letters which petitioner wrote to the Court, and by petitioner's demeanor on the stand at the hearing held before me. I find as a fact that petitioner was not mentally incompetent or otherwise impaired at the time he pleaded guilty. I further find that he pleaded guilty knowingly and deliberately after consultation with competent and experienced counsel and in view of the overwhelming evidence of his guilt of the offenses charged against him.

■ In addition, I find that there is no credible evidence tending to show that petitioner's trial counsel knew about the petitioner's prior psychiatric history during the time that he represented petitioner up to and including the sentencing hearing of December 19, 1966. Petitioner testified before me that he (petitioner) never told counsel about it. I disbelieve the petitioner's testimony that codefendants so informed counsel.[9]

I find no factual basis for petitioner's claim that he was denied his right to the effective assistance of counsel.

I find that at no time, either prior to or after the imposition of final sentence upon the petitioner, did the Court, or the United States Attorney, or petitioner's counsel, have reasonable cause to believe that petitioner was insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense. I find that petitioner was sane and mentally competent at every stage of the proceedings against him.

I find that the Court accepted petitioner's pleas of guilty only after addressing the defendant personally and determining that the pleas were made voluntarily with understanding of the nature of the charges and the consequences of the pleas. I further find that the Court did not enter final judgment upon the pleas of guilty until it was satisfied that there was a factual basis for the pleas. The Court complied with all the requirements of Rule 11 of the Federal Rules of Criminal Procedure.

The petitioner's motion is denied.

---

efforts to conceal his participation in the preparations (Tr. of Dec. 6, 1966, pp. 78–83).

6. Separate Tr. of Dec. 8, 1966.

7. Tr. of April 3, 1967, pp. 22–23, 53–64.

8. *Id.*, p. 29 et seq.

9. Petitioner did not call trial counsel to testify at the hearing before me, nor was it suggested that counsel was unavailable.